## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ARMOND WHITE and JOHNNY THOMAS, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 18 CV 1404 |
| | ) | |
| CITY OF CHICAGO and CHICAGO | ) | Judge John J. Tharp, Jr. |
| POLICE OFFICERS ESCOBEDO, | ) | |
| BRANDT, SOTO, DIAZ, ZARAGOZA, | ) | |
| CUELLAR, ESPINOSA, BERNACIAK, | ) | |
| and BRINK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Armond White and Johnny Thomas seek to hold several Chicago Police Department officers liable for constitutional violations and tortious conduct arising from an allegedly unlawful *Terry* stop. They have also sued the City of Chicago as the officers' employer. The defendants have moved for summary judgment, but there are disputes of fact relevant to whether the officers who initiated the stop had a reasonable basis to suspect that the plaintiffs were engaging in any criminal activity. Accordingly, the defendants' motion for summary judgment is denied as to those officers. The motion is granted, however, as to the remaining officers, who merely arrived on scene as backup for the officers who conducted the stop.

## FACTUAL BACKGROUND[1]

Armond White and Johnny Thomas worked together as delivery drivers for Sears. They drove to Chicago after work on January 26, 2018, to pick up dinner.[2] PSMF (ECF No. 115) ¶¶ 69-

---

[1] Unless otherwise noted, the following facts are undisputed.

[2] White and Thomas were not from the area. Their girlfriends' families lived there. DSMF (ECF No. 98) ¶ 8.

70. Thomas was driving his car, and White was in the front passenger seat. The pair picked up White's friend, Anthony Lewis, who White wanted to see while in the area. PSMF ¶ 71. Lewis asked if he could make a quick stop at a relative's home. The plaintiffs obliged. It was around 7:30 p.m. and dark outside.

Shortly before they reached Lewis's relative's home in a residential southside neighborhood, Thomas noticed what he suspected was an unmarked police vehicle pass him in the opposite direction and then make a U-turn to get behind him. Thomas was unalarmed because he knew he had done nothing wrong. There is no evidence that the officers saw Thomas commit a traffic violation. With the police vehicle trailing him, Thomas stopped on the right-hand curb in the area of 7800 S. Sangamon Street and let Lewis out. PSMF ¶¶ 72-74.

Chicago police officers Brandt, Escobedo, and Soto were in the police vehicle that made the U-turn. The officers had been patrolling the area in an unmarked tactical squad car when they saw the plaintiffs' vehicle. DSMF ¶ 7. Escobedo was driving, Soto was in the front passenger seat, and Brandt was in the passenger-side backseat. They were on an overtime assignment, patrolling for robberies, which were occurring with relatively high frequency in the area, along with other crimes. (In fact, there was an attempted robbery of undercover officers on a narcotics investigation only a night before, about one block away from where they encountered the plaintiffs' vehicle.) DSMF ¶ 9.

The parties dispute much of what transpired next. But before delving into the parties' competing accounts, the Court notes that the record contains footage from multiple bodycams (or body-worn cameras, "BWC"), which were worn by the aforementioned officers, as well as most of the other officers who arrived on the scene a few minutes later. *See* Digital Exs. 4-10 to DSMF (ECF No. 102). Since the parties do not contest the authenticity of the BWC footage, *see* Pls.'

2

Resp. to DSMF (ECF No. 114) at ¶ 5, the Court's findings will privilege the BWC footage's portrayal of the events—where it is sufficiently clear—over either party's factual assertions that are incompatible with it. *See Scott v. Harris*, 550 U.S. 372, 378-79 (2007); *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016). Critically, however, the BWC video only starts some 15 seconds before the police officers pulled alongside the plaintiffs' car; there is no footage of what was occurring or what was seen before that point.

### Initial Approach and Detention

The officers testified—and the plaintiffs dispute—that as they were patrolling, they saw a person, now known to be Lewis, "engaging with the [plaintiffs'] vehicle," and then hasten away into a nearby home upon seeing the officers' squad car.[3] DSMF ¶¶ 11-12. There is no video of what the officers saw at this point and the time at which the officers observed this interaction is not clear. The officers contend that they continued their approach toward the plaintiffs' vehicle to investigate further because Lewis's behavior roused their suspicions that a drug transaction was taking or had taken place. It is undisputed, however, that none of the officers tried to locate, follow, or apprehend Lewis. PSMF ¶¶ 78-80.

The officers stopped alongside Thomas's parked car. They did not turn on any police lights or, according to their testimony, decide to initiate a stop at that time because they didn't know for sure whether anyone was in the vehicle. DSMF ¶¶ 12-13. Officer Soto got out of the police vehicle and used his flashlight to look into the suspect vehicle, revealing that it was occupied. In the defendants' telling, the passenger (now known to be White) then "bent all the way down towards

---

[3] Specifically, the officers testified they saw "an individual leaning into a vehicle, look up in [the officers'] direction and disengage from the vehicle" when the officers' car was about three houses down from Thomas's parked car. Brandt Dep. Tr. 11:22-12:12, Ex. 11 to DSMF (ECF No. 98-11); Escobedo Dep. Tr. 23:11-25:18, Ex. 12 to DSMF (ECF No. 98-12).

3

the floor board of the vehicle," and put something under the seat (or at least made the motion, since they could only see his upper torso), prompting all three officers to exit the squad car. DSMF ¶ 15; Escobedo Dep. Tr. 29:15-18; Soto Dep. Tr. 19:14-21, Ex. 13 to DSMF (ECF No. 98-13). By that time, the third person, Lewis, was already in the home or behind the fence of the property. Soto Dep. Tr. 17:20-18:2. Officer Escobedo drew his weapon and pointed it at White who, the defendants maintain, had refused to raise his hands as the officers instructed. Escobedo was the only one of the officers to draw his service weapon.

The plaintiffs tell a different story. According to them, Thomas pulled over and stopped, Lewis get out of the car and immediately walked to the house without any "lingering" or other interaction with anyone in the car, and the police officers must have been able to see as much.[4] Further, the plaintiffs contend that White, in the front passenger seat, was playing on his cellphone as the officers arrived, and the officers must have seen the phone screen's light shining on his face. PSMF ¶ 75. From the plaintiffs' perspective, the officers suddenly exited their squad car, flashed lights at the plaintiffs, pointed a gun, and yelled directions at them. White testified that he was disoriented and thought he was being robbed. PSMF ¶¶ 76-77. He dropped his cellphone as he leaned forward to see what was happening on the driver's side of the car.

The BWC recordings provide some important clarity to the events in question. At the beginning of the footage, there is little to no visibility of the road or the plaintiffs' vehicle for any BWC—only views of the dashboard and the sky and buildings overhead. But it is apparent that

---

[4] Plaintiffs testified that Lewis just said, "I'll be right back," and got out, White Dep. Tr. 131:8-20, Ex. F to PSMF (ECF No. 114-6), so the officers must therefore have seen that there was no interaction between Lewis and the car other than that he got out of it. Thomas Dep. Tr. 121:10-12, Ex. E to PSMF ("Right, that's why I'm wondering why [the officers] ain't see him get out of my car."). The plaintiffs further testified that White, who was in the passenger seat and thus nearest to the curb where Lewis exited, did not speak to Lewis after Lewis got out and said he'd be right back; White was just on his phone.

the officers were driving straight for at least fifteen seconds before they pulled up alongside the plaintiffs' vehicle. (Therefore, at least fifteen seconds passed between the completion of the officers' U-turn and their stop next to the plaintiffs, with Thomas pulling over and dropping off Lewis at some point in between.) The footage did not capture Lewis or any of his actions as he got out of Thomas's car.

The officers came to a stop next to the plaintiffs. Officer Soto exited without hesitation. (Soto BWC T01:30:53). As he was getting out, Soto turned on his flashlight and illuminated the inside of the plaintiffs' vehicle. (Soto BWC T01:30:53). Thomas and White were immediately visible and the driver's window went down. The plaintiffs were motionless with the flashlight on them for a couple of seconds. While the suspects were sitting mostly still, Escobedo and Brandt also exited the squad car. (Escobedo BWC T01:30:56; Brandt BWC T01:30:57). Thomas raised his hands as all three officers exited the car. (Soto BWC T01:30:56-57). The audio turns on at T01:30:57 for the Escobedo BWC; the audio for the BWC of the other officers was activated a few seconds later. White remained motionless until T01:30:58, when he can be seen on Soto's BWC footage starting to lean forward. The first time that one can hear "Put your hands up," is at T01:31:01, (Escobedo BWC), though that does not necessarily mean no officers instructed the plaintiffs to do so before T01:30:57 when Escobedo's BWC audio turned on.

White, slightly hunched over, appeared confused and immobile for several seconds. Officer Soto's BWC footage shows White's right hand on the door's armrest and his left hand empty, mostly still (except for a raised-palm, "what's going on" gesture); in the video, he does not appear to be placing anything on the floor of the car or under the seat. (Soto BWC from T01:30:54-

T01:31:06).[5] Escobedo was at the front of the plaintiffs' car with his gun pointed at White (gun pointed at White from T01:31:04-T01:31:25, Escobedo BWC). White's hands were raised within four seconds of Escobedo's first recorded command. At the point when Escobedo began pointing his weapon at White, Thomas had already rolled down his window, Officer Soto had already been out of the car for about 9 seconds, and Brandt had already rounded the vehicle from behind and arrived at the passenger side next to White's door, (starting at Brandt BWC T01:31:01).

It was not until Brandt opened White's front passenger door and instructed White to put his hands up that he did so at T01:31:06. Meanwhile, Thomas was in the driver's seat with his hands up, explaining to the officers that they must have been mistaken; they were just deliverymen, not the "Ellis" or "Alex" who the officers suggested they thought they were stopping. (Soto BWC T01:31:05-T01:31:37). As Soto directed White to put his hands up, he addressed White by the name of "Alex," prompting White to question, "Alex?" and Thomas to say: "That's not Alex, that's Armond." Thomas continued: "You got the wrong guys. We just got off work, man. We work at Sears. Truck drivers."

### *Restraining the Plaintiffs, Frisking Them, and Searching the Vehicle*

The BWC video captured all the remaining events. The officers proceeded to remove both plaintiffs from the vehicle and restrain them. Officer Brandt took White out of the vehicle and handcuffed him. DSMF ¶ 25. Officer Soto did the same with Thomas. DSMF ¶ 26. They moved the plaintiffs to the back of Thomas's vehicle. It was at or around this time that officers Bernaciak and Zaragoza arrived, eventually followed by officers Brink, Espinosa, Cuellar, and Diaz, who were responding to a radio request for backup by Officer Escobedo. DSMF ¶ 27. These responding

---

[5] That something is visible on an officer's BWC footage does not necessarily mean that it was visible to the officer who was wearing that camera (or to any others, for that matter). The bodycams obviously show slightly different vantage points from the officers' eyes.

officers were not apprised of the circumstances giving rise to the plaintiffs' detention behind Thomas's vehicle.

Officers Escobedo and Brandt searched Thomas's vehicle, including various compartments and cigarette packs, and Soto explained to the plaintiffs that they had suspected a drug transaction and then had seen White "lean under the seat," and that was why they were being cuffed. T01:32:50. About three-to-four minutes into the stop, at around T01:34:15, the officers had completed their search of the plaintiffs' persons and the vehicle.[6] No drugs or weapons were found.[7] To this point, Thomas and White were calm; White said at least six times, "I can't wait to tell my lawyer about this," and chuckled briefly when responding to Escobedo's question: "Do y'all stay on this block?," stating, "No, we not from here. What the heck's going on, bro?" (Escobedo BWC T01:31:59-01:32:05). Neither resisted physically or made any attempts to flee.

Once the search of the car concluded, however, White supplemented his comments that he looked forward to telling his lawyer about these events with protests about the lawfulness of the search of the car. Rather than ignore these comments, as he had White's statements about his lawyer, Escobedo began arguing with White, advising White not to tell him how to do his job. During this argument, White began complaining that his arm was hurting at around T01:34:46. Officer Soto responded by asking him if he was "still crying" and then told him to "shut up already." White then asked, "Can I get out of the cuffs now?" at T01:45:53. He repeated that his wrists were hurting because the handcuffs were too tight at T01:34:56. The officers initially

---

[6] Escobedo's BWC footage shows his search of the vehicle concluding at around T01:33:41. Officer Brandt's search concluded at around T01:34:15.

[7] Officer Bernaciak, who frisked the plaintiffs, found a boxcutter on Thomas's person, presumably because he had recently left a shift as an appliance deliveryman. The parties dispute whether Officer Bernaciak frisked Thomas because he believed he saw a knife in his pocket or he just happened to find it when reaching for Thomas's identification. See Pls.' Resp. to DSMF ¶ 31.

ignored his complaints and insisted on asking for his identification while he continued to complain and make movements with his hands cuffed behind his back, which the defendants argue can contribute to wrist injuries. As the officers removed White's identification from his pocket, Brandt readjusted White's handcuffs at T01:35:42 and White's complaints ceased. DSMF ¶ 52. Officer Soto ran the plaintiffs' licenses and the vehicle's license plate, found no outstanding warrants or other issues, and eventually uncuffed White at around T01:38:25 and Thomas at around T01:39:10. The stop lasted approximately 10 minutes.

The plaintiffs allege that this encounter left both of them traumatized. As for physical injuries, White has offered evidence that he sought treatment from an urgent care center in the days that followed and was diagnosed with a carpal tunnel injury due to the use of handcuffs. The parties dispute the severity of White's physical injuries, including whether White missed out on any earnings as an appliance delivery driver as a result of the injury to his wrist and hand. Thomas has not alleged any physical injuries.

## ANALYSIS

The plaintiffs seek to hold the officers liable under 42 U.S.C. § 1983 for violating their Fourth Amendment rights to be free from unreasonable searches and seizures, as well as under some related state law causes of action. Specifically, they are suing officers Brandt, Escobedo, Soto, and Bernaciak for excessive force during the seizure (Count I); officers Cuellar, Diaz, Zaragoza, Espinoza, and Brink for failing to intervene in the unlawful use of force and search and seizure (Count II); all defendant officers for illegally seizing and searching the plaintiffs' persons (Count III); and officers Brandt and Escobedo for illegally searching plaintiff Thomas's vehicle (Count IV; on behalf of Thomas only). As for the Illinois state law claims, they are seeking to hold the City of Chicago liable for indemnification of its employee officers under 745 ILCS 10/9-102 (Count V); officers Brandt, Escobedo, Soto, and Bernaciak for battery (Count VI); and officers

Brandt, Escobedo, and Soto for assault (Count VII). *See* Second Am. Compl. (ECF No. 24). The defendants have moved for summary judgment on all counts.

Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Love v. JP Cullen & Sons, Inc*., 779 F.3d 697, 701 (7th Cir. 2015). If the moving party has demonstrated the absence of a disputed material fact, then the burden shifts to the nonmoving party to "provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

## I.     Fourth Amendment Rights

The conduct giving rise to the plaintiffs' claims took place during a *Terry* stop, which is the shorthand for when a law enforcement officer briefly detains an individual on the street for investigatory purposes. *See generally Terry v. Ohio*, 392 U.S. 1 (1968). Although less intrusive than a traditional arrest, a *Terry* stop is still a seizure within the meaning of the Fourth Amendment. *Terry*, 392 U.S. at 26-27; *Dunaway v. New York*, 442 U.S. 200, 208-09 (1979). Accordingly, every *Terry* stop is subject to the Fourth Amendment's requirement, applicable to the states through the Fourteenth Amendment, that all searches and seizures be reasonable.[8] *See* U.S. Const. amend. IV; *Terry*, 392 U.S. at 19.

"[I]n evaluating the reasonableness of an investigative stop, we examine first whether the officers' action was justified at its inception and, second, whether it was reasonably related in

---

[8] Including those of people in vehicles. "The authority and limits of the [Fourth] Amendment apply to investigative stops of vehicles…" *U.S. v. Sharpe*, 470 U.S. 675, 682 (1985) (collecting cases).

scope to the circumstances which justified the interference in the first place." *U.S. v. Glenna*, 878 F.2d 967, 971 (7th Cir. 1989). The Supreme Court explained in *Terry* that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. And "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id*. at 21-22. In other words, the Court must take stock of all the specific, articulable facts known to the detaining officers (*i.e.*, the totality of the circumstances) at the points in time they made each intrusion, evaluate the rational inferences that can be drawn from those facts in a holistic manner, and judge against the objective standard of reasonableness whether the officers' intrusive acts—that is, each invasion of the plaintiffs' personal security: uses of force through display of weapons, handcuffs, and physical contact, searches of the plaintiffs' persons (frisks), and vehicle searches—were appropriate.

Accordingly, the Court will examine each stage of this encounter, starting with whether the record supports a finding on summary judgment that the officers were authorized to initiate the *Terry* stop in the first place.

### A.    Reasonable Suspicion to Justify Initiating the Stop

While an officer needs probable cause to initiate a warrantless arrest under the Fourth Amendment, *Terry* "authorizes brief investigatory detentions based on the less demanding standard of reasonable suspicion that criminal activity is afoot." *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014); *see also United States v. Lopez*, 907 F.3d 472, 478 ("The reasonable suspicion standard is a lower bar than the probable cause standard necessary for an arrest, but the police are not entitled to detain a person for questioning based only on a hunch." (citation omitted)). Further, "the determination of reasonable suspicion must be based on commonsense judgments and

inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). The distinction between *Terry* stops and arrests, and the more lenient standard for the former, provides "some latitude for police to detain where 'the intrusion on the citizen's privacy was so much less severe than that involved in a traditional arrest that the opposing interests in crime prevention and detection and in the police officer's safety could support the seizure as reasonable.'" *Bailey v. U.S.*, 568 U.S. 186, 193 (2013) (quoting *Michigan v. Summers*, 452 U.S. 692, 697-98 (1981)).

But in determining whether the stop was based on a reasonable suspicion, it is necessary to first delineate the point in time at which the plaintiffs were seized. *See Terry*, 392 U.S. at 16 ("Our first task is to establish at what point in this encounter the Fourth Amendment becomes relevant."). Only then can the Court take stock of all the circumstances potentially justifying the stop. Based on the BWC footage, it is apparent that the officers seized the defendants within seconds of coming to a stop alongside them. The BWC footage shows that the squad car came to a stop alongside the plaintiffs' parked vehicle at or around T01:30:49. Officer Soto appears to exit the squad car as soon as it comes to a halt and then flash his light at the plaintiffs' vehicle. (Soto BWC T01:30:50).[9] Soon thereafter, at or around T01:30:56, officers Escobedo and Brandt exit from the squad car as well. At this time, the plaintiffs were seized. Officer Soto is standing outside of the vehicle, with a flashlight pointed at the plaintiffs, and Thomas's hands are up at T01:30:57. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").

---

[9] This is contrary to Officer Soto's testimony that he only stepped out of the vehicle after flashing a light on the plaintiffs and then seeing White bend over in the front seat. Soto Dep. Tr. 19:11-21:23.

The defendant officers argue that the record warrants a finding of reasonable suspicion as a matter of law. They offer the following circumstances that they contend are conclusive as to the issue: (1) the neighborhood was known to the officers as a "high crime area," (2) the officers saw a man engage with the plaintiffs' vehicle and then abruptly leave as the officers approached, (3) White was bent over in the car and appeared to have been tucking something under his seat, (4) White did not immediately comply with the officers' directions to put his hands up, and (5) the interaction took place on a dark street. Defs.' Memo. (ECF No. 97) at 9-10.

On this record and at this procedural stage, the officers' case for having reasonable suspicion at the time of the seizure is like a house of cards built upon a foundation of sand. First and foremost, the timeline outlined above precludes the officers from arguing that the initial seizure was motivated in part by their observation that White bent over and failed to comply with the directions to raise his hands. This is because the officers saw White bend over and then fail to raise his hands *only after* they had seized the plaintiffs.[10] Again, White bent over at T01:30:58-59, which is after each officer had exited the squad car and started to surround the plaintiffs' vehicle.[11]

The remaining circumstances do not suffice to support a finding that any of the officers had, as a matter of law, reasonable suspicion to detain either of the plaintiffs. If the officers' account that they observed what they believed to be a drug transaction is credited, the initial stop may have been warranted. But their account cannot be credited at this juncture because the relevant facts are disputed. As discussed above, the parties dispute whether Lewis leaned in and "engaged

---

[10] For reasons discussed in following sections, the defendants would still not meet their burden as to reasonable suspicion to justify the *Terry* stop even if the Court were to consider this circumstance in its evaluation.

[11] The defendants point to a screenshot taken at this time as the instance of bending over that gave rise to their concern. Defs.' Reply (ECF No. 120) at 3.

with" the plaintiffs' vehicle, as the defendants maintain. The plaintiffs testified, to the contrary, that Lewis got out of the car and walked toward the house. The bodycams did not capture this circumstance and so cannot resolve the dispute. Thus, construing the facts in favor of the nonmovant plaintiffs, the officers were driving behind the plaintiffs, watched them pull up to the house, stop, and let someone out of the car, who then began walking toward a house. That's hardly suspicious regardless of the area or time of day.

Even if the officers observed Lewis hasten away (a "brisk walk," Escobedo Dep. Tr. 25:24-26:4) *only after* noticing the officers' vehicle, this simply does not rise to the level of suspicious "unprovoked flight" in other cases where such evasive behavior was deemed a weighty circumstance giving rise to reasonable suspicion. *See, e.g.*, *Wardlow*, 528 U.S. at 121-122 (officers observed individual standing next to a building in an area known for heavy narcotics trafficking holding an opaque bag who then looked in the direction of a four-car police caravan and ran away). Standing around on a corner doing nothing, seeing officers, and then running away is suspicious; walking briskly from a car to a house on a January night in Chicago is not. That this conduct occurred in a "high crime area" adds nothing to the mix other than an additional reason to get inside the house quickly.[12] Moreover, the record does not even mandate a finding that the officers were clearly identifiable as law enforcement to someone in Lewis's position—their squad car was unmarked, and they had not activated any signals or sirens.

Therefore, the Court finds that the defendants have not met their burden on summary judgment as to the issue of whether the *Terry* stop initiated by officers Brandt, Escobedo, and Soto

---

[12] Justice Stevens' observation in a concurrence in part and dissent in part is relevant here: "On the contrary, because many factors providing innocent motivations for unprovoked flight are concentrated in high crime areas, the character of the neighborhood arguably makes an inference of guilt less appropriate, rather than more so." *Illinois v. Wardlow*, 528 U.S. 119, 139 (2000) (J. Stevens, concurring in part and dissenting in part).

was justified at its inception. And to the extent that the officers justify any of their further actions on having reason to suspect that a drug transaction had just taken place, those arguments rest on the same fact disputes and cannot be credited at this juncture.

### B.     Reasonableness of the Officers' Conduct Throughout the Stop

Pointing a handgun at a suspect, removing him from a car, and handcuffing him are applications of force that constitute seizures. Pat-downs/frisks of a suspect's person and vehicle sweeps are searches. These are all "intrusions" subject to Fourth Amendment limitations.

Examining the lawfulness of each intrusion entails a slightly different analysis, but at bottom each requires that the officers reasonably feared for their safety based on the danger posed by the plaintiffs. *See Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) ("[W]hile police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there is reason to fear danger."); *Cruz v. City of Chicago*, 20-CV-250, 2021 WL 2645558 at *5-6 (N.D. Ill. June 28, 2021) (recounting the reasonableness standard for the use of force, specifically in the form of pointing a deadly weapon, during a seizure); *United States v. Lopez*, 907 F.3d 472, 485 (7th Cir. 2018) ("Even when a *Terry* stop is justified, whether a frisk is also justified is a separate question. . . . For a frisk to be lawful, it must be based on reasonable suspicion that 'criminal activity may be afoot and that the persons with whom [the officer] is dealing may be armed and presently dangerous.'" (quoting *Terry*, 392 U.S. at 30) (citations omitted)); *Pennsylvania v. Mimms*, 434 U.S. 106, 110-12 (1977) (holding that police may order someone out of a vehicle during a traffic stop and frisk him for weapons if there is a reasonable belief that he is armed and dangerous); *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) ("[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts,

reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." (quoting *Terry*, 392 U.S. at 21)).

With respect to the use-of-force intrusions specifically, "[a] Terry stop may be transformed into a formal arrest requiring probable cause if an officer's use of force is sufficiently disproportionate to the purpose of the stop—which may include ensuring the safety of the officers or others—in light of the surrounding circumstances." *Matz v. Klotka*, 769 F.3d 517, 524–25 (7th Cir. 2014).

The defendants argue that the officers' intrusions in this case were constitutional as a matter of law. To succeed on their motion for summary judgment, the defendants must be able to show that each intrusion was reasonably necessary to effectuate the purpose of the stop and justified by the circumstances known to the officers at the time of each intrusion. *See Terry*, 392 U.S. at 20-21. The defendants state the following to justify the reasonableness of their actions:

> Defendant Officers possessed enough facts to suspect Plaintiffs were armed, chief among them White's placement of his hands outside the view of the officers and delay in raising his hands. What the police saw when they arrived near 79th and Sangamon was Mr. Lewis engaging with the car and then walk quickly away when they approached. This coupled with the violent actions in the neighborhood, the Defendant Officers' knowledge of the area, and Plaintiff White's appearing to "tuck" evidence provided "ample authority" to have Plaintiffs out of the car and further investigation

Defs.' Memo. at 12.

It is unnecessary to re-hash why, viewing the facts favorably toward the plaintiffs, Lewis's actions were not suspicious, even in light of the contextual circumstances. The Court has already explained why the officers did not, as a matter of law, have reasonable suspicion that criminal activity was afoot or that the plaintiffs were potentially dangerous at the moment the officers initiated the stop. But given that the officers made various additional intrusions *after* White leaned forward in the passenger seat, it is necessary to examine the details of that circumstance and its

effect on the officers' appraisals of the situation.[13] The same is true for White's failure to immediately raise his hands.

A triable issue of fact exists as to whether White's actions upon being seized could have led a reasonable officer to fear for his safety at any point during the course of the stop. To begin, a jury could reasonably conclude, particularly in light of the BWC footage, that the defendants' claim that White "bent over and … appeared to tuck something under the seat of the car" is an overstatement; a more accurate description is that White leaned forward in his seat slightly and his hands were visible to Soto's bodycam at multiple points before, during, and after he did so. Moreover, at the point that the officers claim that they feared White might be tucking a weapon under the seat, Soto was standing next to the car, shining a flashlight at the occupants, and directly observing what they were doing, and Officer Brandt was already at a vantage point to see White's lap and hands by the time Officer Escobedo was rounding the front of the car with his gun pointed at White. Based on these circumstances, a rational jury could conclude that the officers' purported concerns about their safety based on White's actions were unwarranted. So, too, could a rational jury conclude that the officers concern for their safety was reasonable, particularly if the jury credited the officers' accounts that they had just observed what they reasonably believed to be a drug transaction involving an occupant of the car.

Moreover, the same duality arises in this case as to whether a reasonable juror could find that it was unreasonable for the officers to infer danger when White did not immediately raise his hands. Although the analysis puts the factfinder in the officer's shoes, not the suspect's, reasonable

---

[13] Even if the officers initially stopped the plaintiffs without reasonable suspicion that they were engaged in criminal activity or armed/dangerous, they were entitled to take reasonable steps to ensure their safety if the plaintiffs' actions following the initially unlawful seizure made them reasonably fear for their safety in light of the facts they knew earlier.

officers are expected to make reasonable inferences about what happens when they suddenly surround unsuspecting occupants of a car with flashlights and guns with little to no warning beforehand. *Cf. Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (holding that an officer violates the Fourth Amendment if he "unreasonably create[s an] encounter" in which an individual would be "unable to react in order to avoid presenting a deadly threat to [the officer].") . Recall that these officers were patrolling in an unmarked squad car. They did not pull over the plaintiffs. They did not approach the plaintiffs using police lights or any other signals that they were law enforcement. Under these circumstances, a jury could conclude that White's brief delay in completely raising his hands—during which his actions were in view of Officer Soto and later Brandt—as he leaned over to see what was happening, did not justify Escobedo's drawing of his weapon. This holds true even in light of the other circumstances such as the high-crime area and the time of day. But, again, if the jury found that there was reason to suspect that a drug transaction involving an occupant of the car had taken place, that predicate could also reasonably allow the jury to conclude that there was more to White's delay in raising his hands than momentary disorientation.

Some examples of "close calls" illustrate that this was not a situation in which the officers' concerns warranted, as a matter of law, the brandishing of a firearm at a suspect. In determining whether the use of handcuffs and drawing of weapon during an investigatory stop was reasonable given the circumstances in *Matz*, the Seventh Circuit deemed it a "close" issue. 769 F.3d at 525. Without recounting all the facts in that case, those circumstances were far more threatening than the ones here. *Id.* at 526 ("[The officers] were pursuing an individual suspected of having committed armed robbery and possibly murder who was a member of the Latin Kings gang. Not only were they outnumbered, they were approaching a moving vehicle containing individuals who

had been with [the gang member] just moments beforehand. Given the possibility that [the gang member] was hidden inside the vehicle, their clear disadvantage attempting on foot to stop a moving vehicle, and the possibility, given the nature of [the gang member's] suspected crimes, that individuals in the car may have been armed, it was not unreasonable to draw weapons to safely effect the stop.").

Another case evaluating use of force (in the form of handcuffs) that the Seventh Circuit considered "a close one" is *Glenna*. 878 F.2d at 973. The officer in that case had already seized a firearm and a small explosive from the suspect after stopping him based on a tip that he was involved in a drug deal and was in possession of several small weapons and an explosive device. *Id*. at 968-69. Suffice it to say, again, the conduct in this case does not come close to the threat level present in *Glenna*.

Other cases where there are more-circumstantial justifications for use of force that are nonetheless reasonable—and don't result in the conversion of the *Terry* stop into an arrest—typically involve reasonable suspicions that the suspects were engaged in crimes that are associated with violence or weapons. *See, e.g.*, *U.S. v. Snow*, 656 F.3d 498, 501 (7th Cir. 2011); *Howard v. Ealing*, 876 F. Supp. 2d 1056, 1066 (N.D. Ind. 2021). Since a jury could reasonably conclude that no reasonable suspicion existed as to whether the plaintiffs were engaged in any crime, these lines of cases add little to the defendants' contentions.

Finally, the same disputed issues of material fact preclude granting summary judgment in favor of defendant officers Brandt and Escobedo as to their warrantless search of Thomas's car. To conduct a protective sweep of the plaintiffs' vehicle, the officers needed to reasonably fear for their safety. *Long*, 463 U.S. at 1049. As discussed in detail above, a reasonable jury could find that the officers had no basis to suspect there was a weapon in the car. Insofar as their search involved

opening compartments too small to contain a weapon, *e.g.*, the cigarette pack (Brandt BWC at T01:33:47), such portions of the search were directed toward uncovering evidence of a crime, for which the officers needed probable cause. *See U.S. v. Kizart*, 967 F.3d 693, 695 (7th Cir. 2020). If the jury finds that the officers lacked reasonable suspicion that the plaintiffs were engaging in a drug transaction, as the Court has concluded a reasonable jury could, then the officers certainly could not meet the higher standard for probable cause.

For these reasons, the defendants have not met their burden as to whether officers Brandt, Escobedo, and Soto's intrusions throughout the course of the stop were justified based on a reasonable apprehension of danger or proportionate to the needs of the stop. As discussed *infra* n.16, the defendants have met their burden as to whether Officer Bernaciak—a later-arriving officer—was justified when he frisked both of the plaintiffs.

### C. Duration of *Terry* Stop

In addition to restraining a suspect's movements in a way that's more consistent with arrest than an investigatory stop, another way officers can exceed the permissible bounds of a *Terry* stop and venture into arrest territory is by unreasonably prolonging the stop. The Seventh Circuit in *U.S. v. Leo* held that:

> A stop that is too prolonged becomes a de facto arrest that must be based on probable cause. Thus, one of three things must happen during a *Terry* stop: (1) the police gather enough information to develop probable cause and allow for continued detention; (2) the suspicions of the police are dispelled and they release the suspect; or (3) the suspicions of the police are not dispelled, yet the officers have not developed probable cause but must release the suspect because the length of the stop is about to become unreasonable.

792 F.3d 742, 751 (7th Cir. 2015) (cleaned up).

Here, any basis for suspicion, if it ever existed, had essentially dissipated at or around T01:34:15 when the officers had completed their searches of the plaintiffs' persons and vehicle

and found nothing of concern. Nonetheless, the officers continued to detain the plaintiffs in handcuffs for several minutes while arguing with them about the propriety of the stop and searches and asking White to identify himself.[14] Some delay attributable to the latter task might have been justified (see *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 186 (2004) ("it is well established that an officer may ask a suspect to identify himself in the course of a *Terry* stop")), but that justification carries little weight here where the plaintiffs consistently and repeatedly advised the officers that the officers "had the wrong guys" and that neither of them were the "Alex" or "Ellis" that the officers were apparently looking for. And a reasonable jury could conclude that this entire incident could have been shortened by several minutes had the officers been more concerned about identifying the occupants of the car than they were with arguing with them about the propriety of their actions.

By the time the officers had completed their search of the car, they had little to no reason to worry about any danger White or Thomas posed, particularly in light of the fact that they were surrounded by half a dozen officers. It does not matter that, as the defendants emphasize, the entirety of the detention lasted only ten minutes, which is a relatively short amount of time for *Terry* stops in general. What matters is "whether law enforcement has detained the person longer than needed to carry out the investigation that was justified by the reasonable suspicion." *Lopez*, 907 F.3d at 486 ("[A] 15-minute stop would be too long if the investigation justifying the stop

---

[14] The Seventh Circuit has agreed with several sister circuits that "officers do not exceed the permissible scope of a *Terry* stop by running a warrant check, even when the warrant check is unrelated to the crime suspected." *Hall v. City of Chicago*, 953 F.3d 945, 953 (7th Cir. 2020). But there is no case law suggesting that prolonged detention for purposes of running a warrant check, even if it is of a relatively short duration, is permissible absent reasonable suspicion of any criminal activity in the first place. *See id.* at 955 ("name checks of a reasonable duration performed when officers have reasonable suspicion of ongoing criminal activity do not violate the Fourth Amendment").

finished at the 14-minute mark."). A reasonable jury could therefore find that the stop was not conducted diligently, and the duration of the stop was unreasonable because any particularized suspicion of criminality evaporated well before the plaintiffs were free to leave.

### D. Excessively Tight Handcuffs

The same analysis as to the danger posed by a suspect applies in the context of handcuffing during a *Terry* stop. "While there is no categorical rule that an officer's decision to place a suspect in handcuffs *always* transforms the interaction from a *Terry* stop into an arrest, it is the 'rare case' in which 'common sense and ordinary human experience convince us that an officer believed reasonably that an investigative stop could be effectuated safely only in this manner.'" *Mwangangi v. Nielsen*, 48 F.4th 816, 827 (7th Cir. 2022) (quoting *Glenna*, 878 F.2d at 973). In light of the facts and circumstances discussed above, a rational jury could reasonably conclude that handcuffing the plaintiffs was unreasonable.[15]

The plaintiffs also argue that even if the use of handcuffs were reasonable, they were applied with excessive force. "A person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury." *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014). Here, Thomas made no complaint about being cuffed too tightly and White even chuckled in response to Escobedo's question of whether the plaintiffs lived on the block after being cuffed, but after being

---

[15] The defendants assert in their reply brief that the plaintiffs concede that the use of handcuffs was not itself improper, but only the manner in which the cuffs were applied. The Court does not read the plaintiffs' response to make such a concession. The plaintiffs' arguments about the use of handcuffs, to be sure, principally address the manner in which the handcuffs were applied, but their argument about handcuffing is presented generally as an argument about the use of excessive force. See Pls.' Response at 11-12 ("Defendants knew that neither Plaintiff was an immediate threat to their safety. There was no crime at issue, period. Upon consideration of these factors, the force used by Defendants cannot be considered reasonable.").

cuffed for about 6 minutes, White complained that he was in pain, described the nature of his pain (numbness), and posed little risk of flight or threat of injury. Records show that he visited an urgent care clinic soon after the encounter. He was diagnosed with a carpal tunnel injury and prescribed physical therapy.

Although Officer Brandt loosened White's handcuffs less than a minute after his initial complaint, a reasonable juror could find that the officers unreasonably delayed in doing so, first by asking him if he was "still crying" and telling him to "shut up already," and then by conditioning the adjustment on White telling them his name, when they had already asked the same question and had the opportunity to acquire identification earlier in the interaction. (T01:34:09 from Escobedo BWC—before the complaints about the handcuffs—Q: "What's your first name?" A: "Armond"). The defendants suggest that being handcuffed too tightly for 46 seconds is well within constitutional standards, but the Constitution doesn't grant law enforcement a free pass to apply handcuffs too tightly for any period of time; at all times, the fact and manner of handcuffing must be reasonable. And here, again, a rational jury could conclude that it was not reasonable to delay the response to White's complaints until he identified himself again. Granted, White was fidgeting while he complained, which may have exacerbated his injuries, but that is a disputed issue for a factfinder to resolve, not the Court on summary judgement. These circumstances—especially in light of the fact that the Court has not found as a matter of law that the officers had reason to handcuff White at all and their suspicions (reasonable or not) as to any criminality or threat of danger had evaporated by this time—result in a denial of summary judgment as to the excessive force claim.

### E. Failure to Intervene

The Court grants summary judgment to defendants with respect to the failure-to-intervene claim. Officers Soto, Escobedo, and Brandt, as the first officers on the scene, initiated the stop and

proceeded to quarterback the subsequent intrusions during the stop. There is not a sufficiently genuine dispute of fact as to whether the later-arriving officers Zaragoza, Brink, Espinosa, Diaz, and Cuellar, arrived early enough to witness—or were otherwise apprised of—the circumstances giving rise to the plaintiffs' detention. Accordingly, they cannot be held liable for failing to intervene given that earlier events, which were beyond their knowledge or control, could have justified the intrusions that occurred once they arrived.[16] *See Lanigan v. Vill. Of East Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997).[17]

---

[16] This logic also absolves the later-arriving officers of any wrongdoing for their direct participation in effectuating the potentially unconstitutional intrusions. For example, BWC footage shows that once he arrived on scene, Officer Bernaciak (who is alleged to have directly participated in the excessive use of force by frisking the defendants), could hear Soto explaining to the plaintiffs that they were suspected of engaging in a narcotics transaction and that Soto saw White lean for something under his seat. He could also see the plaintiffs' vehicle being searched. Officer Brandt then told him to guard White. Bernaciak Dep. Tr. (ECF No. 98-16) 14:16-18. Bernaciak then frisked both plaintiffs, (Bernaciak BWC T01:32:58-T01:33:22), though he testified he did not frisk White because he had no basis for doing so and he only frisked Thomas because he thought he saw a pocketknife (which ended up being his boxcutter for deliveries). *Id*. at 27:21-28:9. Such conduct and any corresponding liability is more appropriately attributed to the first-arriving group of officers, who had first-hand knowledge of whether the circumstances actually authorized any of the intrusive conduct throughout the course of the stop. Under the "collective knowledge" doctrine, "[t]here is no Fourth Amendment violation if the knowledge of the officer directing the stop … is sufficient to constitute" reasonable suspicion. *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010). The arriving officers could rely in good faith on the directions received from the officers who made the initial stop; if those directions were unlawful because they were not based on reasonable suspicion, the fault lies with the officers who gave the unlawful directions, not the later arriving officers who were acting in good faith. *Cf. United States v. Hensley,* 469 U.S. 221, 232 (1985) (where information relied upon does not establish reasonable suspicion, "of course, the officers making the stop may have a good-faith defense to any civil suit.").

[17] The viability of "failure to intervene" as a theory of liability under the Constitution is questionable. As Judge Easterbrook recently explained in his concurrence in *Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022), "'[f]ailure to intervene' sounds like vicarious liability." But the Supreme Court held in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989) "that our Constitution establishes negative liberties—the right to be free of official misconduct—rather than positive rights to have public employees protect private interests." *Id*. Here, however, the defendants have not challenged the viability of the theory but rather argue only that the plaintiffs have not adduced sufficient evidence to support a jury verdict based on this theory.

### F.    Qualified Immunity

The defendants have invoked the doctrine of qualified immunity to shield the officers from civil liability for their conduct. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). "To overcome a defendant's invocation of qualified immunity, a plaintiff must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established at the time of the challenged conduct. If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017) (cleaned up). For the reasons discussed above, the plaintiffs have adduced sufficient evidence for a reasonable jury to find that officers Brandt, Escobedo, and Soto's actions violated their Fourth Amendment rights.

The remaining question, then, is whether the violative nature of the officers' conduct, viewed in the light most favorable to the plaintiffs, was clearly established at the time. Assuming, as must be done in this context, that the fact dispute about what the defendants observed with respect to Lewis's interaction with the plaintiffs' car is resolved by a jury in the plaintiffs' favor, then it is clear that the defendants' motion for summary judgment based on qualified immunity must be denied because the plaintiffs had a "clearly established right to be free from a *Terry* stop unless the officers had reasonable suspicion that [they] committed a crime." *Milhouse v. N.E. Illinois Regl. Commuter R.R. Corp.*, 16 C 11709, 2019 WL 4573220 (N.D. Ill. Sept. 20, 2019) (citing *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008)). There is, in short, a triable issue as to whether the officers had made "a reasonable error in determining whether there [was] reasonable suspicion." *Jewett*, 521 F.3d at 824 n.4.

24

And as discussed in detail above, that fact dispute also colors the evaluation of whether there was clearly established law prohibiting the defendants' other Fourth Amendment intrusions—namely the search of the car and the use of force (drawing weapon and handcuffing). The case law clearly establishes that these attendant intrusions are only permissible if (a) there is a reasonable suspicion that the suspect has committed a crime typically associated with weapons (*e.g.*, burglary or a drug transaction) and/or (b) there is an articulable suspicion the suspect is armed and dangerous independent from the nature of suspected crime authorizing the stop (*e.g.*, visible outline of a weapon under clothes or furtive movements). *See, e.g.*, *Gentry v. Sevier*, 597 F.3d 838, 847-48 (7th Cir. 2010) ("routine" pat-downs not permitted absent reasonable suspicion of crime involving weapons or other articulable reason to fear for safety of officers or public); *see also* cases cited *supra* Section II.B. Accordingly, as to those intrusions as well, qualified immunity must await resolution of the fact disputes about what the defendants claim to have seen to give them reason to suspect that a drug transaction had occurred or was occurring between Lewis and an occupant of the car. If the jury does not credit the officers' version of the story about what they witnessed prior to the stop, then the officers initiated the stop without reasonable suspicion and continued to intrude on the plaintiffs' Fourth Amendment rights via their uses of force and their searches (of the plaintiffs' persons and Thomas's vehicle) without any subsequently discovered reasonable suspicion or reasonable fear for their safety, which is contradictory to clearly established law.

## II.  State Law Claims

Finally, the defendants have moved for summary judgment on the plaintiffs' state law claims of assault against officers Brandt, Escobedo, and Soto; battery against officers Brandt, Escobedo, Soto, and Bernaciak; and indemnification against the City of Chicago.

Under Illinois civil law, "battery is the 'unauthorized touching' of another that 'offends a reasonable sense of personal dignity.'" *Gill v. Vill. of Melrose Park*, 35 F. Supp. 3d 956, 967–68

(N.D. Ill. 2014) (quoting *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008)). Assault in Illinois "involves intentional conduct that places the plaintiff in reasonable apprehension of an imminent battery." *Padilla v. Bailey*, No. 09 C 8068, 2011 WL 3045991, at *8 (N.D. Ill. July 25, 2011) (citing *McNeil v. Carter*, 742 N.E. 2d 1277, 1281 (Ill. App. 3d Dist. 2001)). In the case of a public employee, liability attaches only if his conduct was willful and wanton. 745 ILCS 10/2–202. A course of action is considered willful and wanton if it "shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1–210. As for indemnification, Illinois law provides, "A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article." 745 ILCS 10/9-102.

In moving for dismissal of these claims as a matter of law, the defendants rest on the lawfulness of their physical contact with the plaintiffs, *i.e.*, that it was reasonable under the circumstances. It is true that the officers would be able to find safe harbor from the state law claims if their actions were justified. But as described above, the defendants have not met their burdens as to the reasonableness of their conduct under the Fourth Amendment as a matter of law. And although "[i]t is entirely possible that unreasonable conduct may not rise to the level of willful and wanton conduct," the Seventh Circuit has recognized that "whether conduct is willful and wanton is ultimately a question of fact for the jury." *Carter v. Chicago Police Officers*, 165 F.3d 1071 (7th Cir. 1998). Therefore, the plaintiffs are entitled to proceed on these claims against officers Brandt, Escobedo, and Soto. Summary judgment on the battery claim is granted, however, to Officer Bernaciak, who did not act unreasonably given that he arrived on the scene later than the initial

26

group of officers and had no reason to doubt that the plaintiffs were detained lawfully based on the earlier-arriving officers' valid reasonable suspicion. *See supra* n.16. Given that officer Bernaciak did not act unreasonably, *i.e.*, his actions were justified based on the information available to him, he cannot be said to have behaved in a willful and wanton manner.

\*　　\*　　\*

For the foregoing reasons, the defendants' motion for summary judgment is granted in part and denied in part. The defendants are entitled to judgment as a matter of law as to all claims against officers Bernaciak, Zaragoza, Brink, Espinosa, Diaz, and Cuellar. The defendants are not entitled to judgment as a matter of law as to the plaintiffs' § 1983 claims against officers Brandt, Escobedo, and Soto, state law tort claims against those three officers, or the indemnification claim against the City of Chicago.

Dated: March 3, 2023

John J. Tharp, Jr.
United States District Judge